# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Douglas A. Kelley, in his Capacity as the PCI Liquidating Trustee for the PCI Liquidating Trust,<br><br>    Plaintiff,<br><br>v.<br><br>Gus Boosalis,<br><br>    Defendant. | Case No. 0:18-cv-00868 (SRN/TNL)<br><br><br><br>**MEMORANDUM OPINION AND ORDER RE: MOTIONS IN LIMINE** |

Andrew B. Brantingham, Christina Hanson, J. David Jackson, Lucas J. Olson, Elizabeth A. Sellers, Dorsey & Whitney LLP, 50 South 6th Street, Suite 1500, Minneapolis, Minnesota 55402, for Plaintiff Douglas A. Kelley, in his Capacity as the PCI Liquidating Trust for the PCI Liquidating Trust.

Daniel J. Frisk, Don R. Grande, and Mark A. Schwab, Grande Frisk & Thompson, 820 34th Avenue East, Suite 200, West Fargo, ND, 58078, for Defendant Gus Boosalis.

SUSAN RICHARD NELSON, United States District Judge

   Plaintiff Douglas A. Kelley, in his Capacity as the PCI Liquidating Trustee for the PCI Liquidating Trust ("the Trustee") and Defendant Gus Boosalis are scheduled for trial in this action on November 26, 2018. The parties have collectively filed seven motions in limine. For the reasons set forth herein, Defendant's motions are denied in part and deferred in part and the Trustee's motions are granted in part and deferred in part.

## I. BACKGROUND

This action is one of numerous lawsuits that has arisen in the aftermath of a multi-billion-dollar Ponzi scheme[1] principally designed and operated by Tom Petters. (*See* Second Am. Compl. ¶ 17 [Doc. No. 4-22].) Petters operated the Ponzi scheme from approximately 1993 to 2008 with the assistance of several associates including Deanna Coleman, Robert White, Michael Catain, Larry Reynolds, Frank Vennes, and Greg Bell. Petters purported to operate a "diverting goods business" through PCI, which contemplated the purchase of electronic goods at wholesale to be resold, at a substantial profit, to large retailers. *United States v. Petters*, 663 F.3d 375, 379 (8th Cir. 2011). However, PCI functioned as the central funding mechanism of Petters' Ponzi scheme, whereby Petters and his associates sought investors' funding to allegedly purchase non-existent electronic goods. *See United States v. Reynolds*, 643 F.3d 1130, 1132 (8th Cir. 2011); *In re Polaroid*, 472 B.R. 22, 36 (Bankr. D. Minn. 2012). Petters used the funds invested by later investors to repay initial investors. (*See* Second Am. Compl. ¶¶ 21, 28–30.)

The Trustee alleges here that Boosalis transferred money to PCI in at least 65 transactions totaling at least $4,640,000 in principal and received Promissory Notes. (*Id.* ¶¶ 39–41.) Ultimately, the Trustee contends, Boosalis received at least $8,380,590 in distributions from PCI, representing a return of the principal that he had invested, plus

[1] A "Ponzi scheme" generally describes a fraudulent investment scheme in which money taken from later participants is paid to earlier participants to create the false appearance that the scheme is generating returns. *See Cunningham v. Brown,* 265 U.S. 1, 7–9 (1924) (describing the schemes of Charles Ponzi).

interest, and distributions representing false profits. (*Id.* ¶¶ 39–42.) The Trustee alleges that the "interest rates" on the transactions between Defendant and PCI ranged from 38.71% to 70.82% on an annualized basis. (*Id.* ¶ 42.)

Petters' Ponzi scheme began to officially and permanently unravel on September 8, 2008, when Coleman revealed to government authorities that she was assisting Petters in perpetrating a massive fraud through PCI. *Petters*, 663 F.3d at 379. Following a criminal investigation, Petters was convicted of numerous counts of fraud, for which he received a 50-year sentence,[2] and several of his co-conspirators were also convicted for their respective roles in the Ponzi scheme.[3]

In October 2008, this Court placed PCI in receivership and appointed Douglas Kelley, now the Trustee, to serve as the equity receiver ("Receiver") of all of the Petters-owned entities, including PCI. (*See* Second Am. Compl. ¶¶ 4–5.) At Kelley's direction, PCI filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Minnesota ("Bankruptcy Court"), and Kelley was appointed the Chapter 11 Trustee for

---

[2] (Second Hanson Decl. [Doc. No. 76], Ex. 1 (*United States v. Petters*, No. 08-CR-364(1) (RHK/AJB), ECF No. 400 at 1 (D. Minn.) [Doc. No. 76-1]) (judgment following jury trial verdict of guilty on numerous counts of wire fraud, mail fraud, money laundering, and two conspiracy counts).

[3] (*See, e.g.*, Second Hanson Decl., Ex. 2, *United States v. Coleman*, No. 08-CR-304 (RHK), ECF No. 40 at 1 (D. Minn.) [Doc. No. 76-1] (judgment following guilty plea to one count of conspiracy to commit mail fraud); *id.*, Ex. 3, *United States v. White*, No. 08-CR-299 (RHK), ECF No. 37 at 1 (D. Minn.) [Doc. No. 76-1] (judgment after a guilty plea to one count of aiding and abetting mail fraud and one count of illegal monetary transactions); *id.*, Exs. 4 & 6, *United States v. Bell*, 09-CR-269 (RHK), ECF Nos. 34 & 68 (D. Minn.) [Doc. No. 76-1] (judgment following guilty plea to one count of wire fraud as set forth in criminal Information).

all the Chapter 11 debtors, including PCI, in a jointly-administered proceeding. (*See id.* ¶¶ 7–9.) Pursuant to a confirmed Chapter 11 Plan, Kelley now serves as the PCI Liquidating Trustee for the PCI Liquidating Trust, the successor to the Chapter 11 Trustee and the bankruptcy estates for the debtors. (*Id.* ¶ 10.)

The Trustee brought this adversary proceeding against Boosalis pursuant to various provisions of the Bankruptcy Code and the Minnesota Uniform Fraudulent Transfer Act, (the "MUFTA"), Minn. Stat. §§ 513.41–.51, to recover, or "clawback," allegedly fraudulent transfers that Boosalis received from PCI, and to impose a constructive trust in connection with any such transfers for the benefit of PCI's bankruptcy estates. (Second Am. Compl. ¶ 15.) The Trustee alleges that every transfer that Boosalis and PCI entered into was based on fraudulent and fabricated financial transactions. (*Id.* ¶ 45.) The Trustee alleges that Boosalis should have been aware, or, through the exercise of due diligence, should have known of the fraudulent nature of the transactions, noting that Boosalis ignored several indicia of fraud and financial irregularity. (*Id.*) He therefore brings fraud-based claims against Boosalis, including fraudulent transfer claims, based on both actual and constructive fraud. (*id.* ¶¶ 50–89.) The Trustee seeks to set aside the transfers and to recover the full amount of the transfers, or, alternatively, the alleged false profits and other payments, along with interest, attorneys' fees, and costs. (*See id.* at 49–52.)

Boosalis has denied the Trustee's allegations and raised a number of affirmative defenses, including: (1) that the transfers were made to him for value and as payment of principal and interest on an antecedent debt; (2) that he took the transfers in good faith and without knowledge of the alleged voidability of the transfers at the time they were received;

and (3) that PCI received reasonably equivalent value for the transfers. (Answer, Aff. Defenses Nos. 11–13 [Doc. No. 4-24].)

In March 2018, the Honorable Kathleen H. Sanberg, the Bankruptcy Court Judge who presided over the adversary action in Bankruptcy Court, denied Plaintiff's motion for summary judgment. (*See* Mar. 28, 2018 Bankr. Ct. Order [Doc. No. 5-29].) At that time, because Boosalis demanded a jury trial and did not consent to a jury trial in Bankruptcy Court, Judge Sanberg transferred the adversary proceeding to this Court. (*See* Mar. 28, 2018 Bankr. Ct. Transfer Order [Doc. No. 1].)

## II.  Defendant's Motions in Limine

### Defendant's Motion in Limine No. 1 [Doc. No. 41]:
### Reasonably Equivalent Value

#### A.  Defendant's Argument

Boosalis argues that any testimony from the Trustee's expert, Theodore Martens, relating to the "reasonably equivalent value" of Defendant's transfers should be excluded. (Def.'s Mem. in Supp. Mot. in Limine No. 1 ¶ 1 [Doc. No. 42].) While Boosalis agrees that Martens possesses expertise as an accountant, he contends that Martens' opinions regarding reasonably equivalent value constitute improper interpretations of substantive law. (*Id.* ¶¶ 14–15.) Furthermore, Defendant argues that if the Court were to allow Martens to opine on the law, it would fall outside the scope of Martens' expertise as an accountant. (*Id.*)

## B.    Trustee's Response

The Trustee argues that Martens does not intend to testify about the legal meaning of "reasonably equivalent value," and that he is qualified to offers his opinion based on his expertise as an accountant. (Pl.'s Mem. of Law in Opp'n to Def.'s Mots. in Limine Nos. 1, 2, 4, and 5 at 13–14 ("Pl.'s Main Opp'n") [Doc. No. 77].)

## C.    Ruling

The issue of "reasonably equivalent value" is relevant to the Trustee's prima facie case as well as Defendant's affirmative defense.  One element of a claim for constructive fraud under the MUFTA requires the Trustee to show that PCI made transfers to Boosalis "without receiving reasonably equivalent value" in return.  *Finn v. Alliance Bank*, 860 N.W.2d 638, 645 (Minn. 2015).  And, as part of Defendant's affirmative defense to the Trustee's claim of actual fraud, Boosalis may show that he took PCI's transfers "in good faith and for reasonably equivalent value."[4] *Id.*  As defined under the MUFTA, "reasonably equivalent value" means that "the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred . . . ."  Minn. Stat. § 513.44.

Although "expert testimony on legal matters is not admissible" because "[m]atters of law are for the trial judge," *S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc*., 320 F.3d 838, 841 (8th Cir. 2003), Boosalis appears to misunderstand the nature of Martens' proposed testimony.  Martens will not testify regarding the legal meaning of

---

[4] Minn. Stat. § 513.44(a)(1).

"reasonably equivalent value." (Pl.'s Main Opp'n at 13.) Rather, as the Trustee asserts, Martens' testimony related to this issue will address the following: (1) the number of separate note transactions between Defendant and PCI; (2) the amount of principal that Boosalis invested with PCI; (3) the interest income that Defendant received pursuant to his loans with PCI; (4) whether the transactions to and from Boosalis were related to potentially legitimate PCI purchases and/or sales transactions; and (5) whether the funds received from or sent to Boosalis were part of the PCI Ponzi scheme. (*Id.*) Such evidence is relevant to the factual question of whether there was an exchange for reasonably equivalent value. This anticipated evidence does not constitute improper opinion on the substantive legal meaning of "reasonably equivalent value." Instead, this testimony will be helpful and relevant to the jury's determination of liability.

However, any such testimony is only admissible subject to adequate foundation being laid. Accordingly, because this motion is premature, the Court defers ruling until trial.

**Defendant's Motion in Limine No. 2 [Doc. No. 43]:**
**Insolvency Analysis**

**A.      Defendant's Argument**

Boosalis also argues that the Court should exclude from evidence Martens' anticipated testimony regarding the insolvency of PCI at the time of Defendant's transfers, which Boosalis contends occurred between 1996 and 2001. (Def.'s Mem. Supp. of Mot. in Limine No. 2 ¶ 16 [Doc. No. 44].)

Boosalis maintains that *Finn*, 860 N.W.2d at 646–47, prohibits any presumption of actual fraud based on the mere existence of a Ponzi scheme. (Def.'s Mem. Supp. of Mot. in Limine No. 2 ¶ 5.) Rather, the Ponzi scheme operator must have been insolvent at the time of each claimed transfer. (*Id.* ¶ 8) (citing *Finn*, 860 N.W.2d at 648–49). Defendant argues that Martens fails to analyze PCI's insolvency on a transfer-by-transfer basis at the time of each transaction. Accordingly, he argues, any testimony regarding PCI's general insolvency must be excluded. (*Id.* ¶¶ 15–16.)

### B. Trustee's Response

Based on Martens' analysis, the Trustee maintains that PCI was insolvent no later than December 31, 1996 and remained insolvent until its collapse in 2008. (Trustee's Main Opp'n at 10.) The Trustee claims that the evidence supports Martens' reasonable inference that PCI was therefore insolvent at the time of each of Defendant's transfers. (*Id.*) Moreover, the Trustee contends, Defendant's argument goes to the weight of this evidence rather than its admissibility. (*Id.*)

### C. Ruling

In fraudulent transfer cases alleging actual fraud, because proof of actual intent "may rarely be established by direct evidence," courts may "infer fraudulent intent from the circumstances surrounding the transfer." *In re Sherman*, 67 F.3d 1348, 1353-54 (8th Cir. 1995). A common method of inferring actual fraudulent intent requires the court to consider whether the transfer in question bears indicia of fraud, or "badges of fraud." *Id.* The MUFTA contains a non-exclusive list of types of evidence that may constitute "badges of fraud." Minn. Stat. § 513.44(b).

Another method that courts have used in cases involving Ponzi schemes is to infer actual fraud by applying the "Ponzi scheme presumption." *See In re Vaughan Co., Realtors*, 477 B.R. 206, 218 (Bankr. D. N.M. 2012) (collecting cases). In such cases, courts have found that the existence of a Ponzi scheme satisfies the requirement of "actual intent." *Id*. Courts applying the presumption have reasoned that "transfers made in the course of a Ponzi scheme could have been made for no other purpose other than to hinder, delay or defraud creditors," *In re Manhattan Inv. Fund Ltd.*, 359 B.R. 510, 517-18 (Bankr. S.D.N.Y. 2007), *rev'd in part*, 397 B.R. 1 (S.D.N.Y. 2007), and that, due to the constant churn of investors' contributions and pay-outs, "[a] Ponzi scheme is insolvent from its inception." *Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006) (citing *Cunningham v. Brown*, 265 U.S. 1, 7–8 (1924)).

In the Minnesota Supreme Court's 2015 decision in *Finn*, however, the court rejected the application of the Ponzi scheme presumption to fraudulent transfer claims under the MUFTA. 860 N.W.2d at 646–50. Rather than applying a presumption based on the form of the entity making the transfer, the court held that the MUFTA "requires a creditor to prove the elements of a fraudulent transfer with respect to each transfer." *Id.* at 647.

The court also considered the question of a debtor's insolvency for constructive fraudulent transfers—and the timing of that insolvency—in noting that "a conclusive presumption that a Ponzi scheme is insolvent from its inception may be incorrect." *Id.* at 649. The court explained,

> [A]s a factual matter, it is not at all clear that every fraudulent investment arrangement that is later determined to be a Ponzi scheme necessarily will have been insolvent from its inception. For example, it is not hard to imagine a debtor that begins as a legitimate business and eventually turns to fraud, which the Respondent Banks insist occurred here. Similarly, a debtor could have assets or legitimate business operations aside from the Ponzi scheme, as Alliance Bank argues here, that it uses to stave off insolvency, at least for a while. Such an entity could be financially stable for a time, whether its stability is measured by the technical definition of insolvency in Minn. Stat. §§ 513.42 and 513.45(a), or the alternate methods of measuring financial distress in Minn. Stat. § 513.44(a)(2).

*Id.* The court acknowledged that such a Ponzi scheme "may be rare," *id.*, but because under such circumstances, the application of the Ponzi scheme presumption could fail to correctly establish insolvency as to the specific date of each allegedly fraudulent transfer, the court rejected the presumption that a Ponzi scheme is insolvent from its inception. *Id.*

Here, Martens analyzed the potential sources and uses of funds transferred between PCI and Defendant to determine if any of the notes issued by PCI were related to potentially real purchases or sales transactions. (Third Hanson Decl. [Doc. No. 78], Ex. 1 (Martens Tracing Report ¶ 10 [Doc. No. 78-1]).) In his detailed Tracing Report, Martens describes his investigative process, including the examination of each transaction between PCI and Boosalis. (*See id.* ¶¶ 11–36.) He ultimately finds "no evidence to indicate that the course/use of the transfers to/from the Defendant were related to potentially real purchases and/or sales transactions. Rather the Defendant's PCI Transactions appear to have been associated with the serial churn of funds observed in connection with the Petters Ponzi scheme." (*Id.* ¶ 12.) Martens references a separate insolvency report that he prepared regarding the financial condition of PCI and PGW at the time of Defendant's transactions with PCI, which involved a review of those entities' financial statements. (*See id.* ¶ 35.)

He offers the opinion that PCI was insolvent by December 31, 1996 at the latest, and never emerged from insolvency. (*Id.*)

Boosalis argues that Martens' opinion regarding PCI's insolvency at the time of the relevant transfers should be excluded because it fails to meet the standard of proof under *Finn*. To be sure, *Finn* foreclosed a creditor from solely relying on the existence of a Ponzi scheme to establish insolvency. *See Finn*, 860 N.W.2d at 647–52. But it did not address the *type* of proof on which a plaintiff could rely to establish a debtor's insolvency. Martens has examined PCI's financial records during a period that includes the relevant period here, 1996 to 2002, and found that PCI was insolvent during that entire period. (*See* Martens Tracing Report ¶ 35.) This review process is not the same as simply relying on a blanket Ponzi scheme presumption, as prohibited by *Finn*.

The Court will not rule on this motion, however, before the testimony in question is proffered. Assuming the proper foundation has been laid, *Finn* does not prohibit this testimony.

### Defendant's Motion in Limine No. 3 [Doc. No. 45]: Evidence of Criminal Prosecutions of Ponzi Scheme Participants

#### A.    Defendant's Argument

Boosalis argues that any reference to the criminal prosecutions and testimony of Tom Petters and his co-conspirators should be excluded from evidence as irrelevant. (Def.'s Mem. Supp. of Mot. in Limine No. 3 ¶¶ 4–5, 7 [Doc. No. 46].) Boosalis asserts that his involvement with PCI, from 1996 to 2001, pre-dated the years-later activities for

which White was convicted.[5]  (Id. ¶¶ 4–5.)  Further, he contends that the convictions of

Petters, Coleman, and Catain were based on their participation in the overall Ponzi scheme,

without reference to specific dates, transactions, or dealings, and evidence concerning their

prosecutions is similarly irrelevant. (*Id.*)

In addition, Boosalis maintains that admission of this evidence would be prejudicial.

(*Id.* ¶ 8.)  Given the lack of temporal proximity, Boosalis contends that this evidence would

be confusing and misleading, inviting the jury to unfairly decide this case based on

emotion.  (*Id.* ¶ 9.)  He asserts that the admission of such evidence would also be a waste

of time, asserting that while the Trustee is attempting "to blanket the entire PCI operation

as a Ponzi scheme," there was "substantial legitimate business for years prior to the

convictions." (*Id.* ¶ 10.)

Boosalis also argues that such evidence is inadmissible under *Finn*.  (*Id.* ¶ 11.)

Essentially, Boosalis contends that evidence of the convictions would serve as a proxy for

the Ponzi scheme presumption, which *Finn* prohibits. (*Id.*) (citing 860 N.W.2d at 647).)

## B.    Trustee's Response

The Trustee asserts that evidence of the criminal convictions of several Ponzi

scheme participants is relevant to establish that PCI functioned as a Ponzi scheme from the

time of its inception in 1994 through September 2008, when the fraud was uncovered.

---

[5] For the same reason, Boosalis also sought to exclude evidence concerning Ponzi scheme participants Vennes and Bell.  (Def.'s Mem. Supp. of Mot. in Limine No. 3 ¶¶ 4–5.) However, the Trustee no longer seeks to introduce evidence concerning their convictions. The Court's discussion is therefore limited to evidence concerning the convictions of White, Petters, Coleman, Catain, Reynolds, and the entity PCI.

(Pl.'s Opp'n Crim. Pros. at 2 [Doc. No. 75].)  The Trustee asserts that he should be allowed to introduce this evidence to rebut Defendant's "unsubstantiated claims" that PCI conducted legitimate business during the time of Defendant's transfers and to prove that PCI "made transfers to Boosalis with intent to defraud its creditors." (*Id.* at 3.)

The Trustee contends that White's conviction was based on his actions from 1995 to 2008, a portion of which time Boosalis was, in fact, engaged in transactions with PCI. (*id.* at 6) (citing Second Hanson Decl., Exs. 3 & 5 (*United States v. Robert White*, No. 08-cr-299, ECF Nos. 37 & 1 ¶ 1 (D. Minn) [Doc. No. 76-1]), and that all of the evidence  with respect to the other convicted participants relates to acts that occurred between 1996 and 2001.  The Trustee contends that *Finn* does not prohibit the admissibility of specific types of evidence offered as proof of fraudulent transfer.  (*Id.* at 4) (citing *Finn*, 860 N.W.2d at 467).  To the contrary, the Trustee argues, *Finn* contemplates the use of this type of evidence, noting that "a court could consider a debtor's operation of a Ponzi scheme" as a badge of fraud.  (*Id.*) (citing 860 N.W.2d at 647).  In sum, the Trustee claims that evidence related to the criminal prosecutions of Petters and his associates is relevant and forms only one part of the Trustee's proof that PCI made a fraudulent transfer to Boosalis.  (*Id.* at 5.)

Moreover, the Trustee claims that Boosalis has failed to meet his burden to exclude the evidence under Federal Rule of Evidence 403, as the convictions are not substantially more prejudicial than probative.  (*Id.* at 7–8.)  The Trustee contends that Boosalis is free to argue to the jury that they should not give any weight to the convictions.  (*Id.* at 8.)  At a minimum, the Trustee asserts, the Court should defer ruling on the relevance and admissibility of any conviction until trial.  (*Id.*)

13

### C. Ruling

The Court agrees with the Trustee that evidence related to the criminal prosecutions of the participants in Petters' Ponzi scheme at the time of Boosalis' transactions with PCI, including participants with involvement throughout the entire life of the Ponzi scheme, is relevant to the question of whether PCI operated as a legitimate business. As noted, *Finn* does not bar any specific *type* of evidence that may be admitted to establish badges of fraud, and in fact acknowledges that courts may consider the debtor's operation of a Ponzi scheme as a non-conclusive badge of fraud. 860 N.W.2d at 647. Granted, *Finn* prohibits any *presumption* or conclusive determination of fraudulent transfer simply due to the existence of a Ponzi scheme. But the Trustee does not seek to invoke such a presumption through the admission of this evidence. Defendant's motion is therefore denied and evidence concerning the criminal convictions of Petters, Coleman, White, Reynolds, Catain, and the entity PCI shall not be excluded based on *Finn*.

### Defendant's Motion in Limine No. 4 [Doc. No. 47]: Transfer-By-Transfer Analysis

### A. Defendant's Argument

Boosalis argues that any testimony from Martens concerning the transfer-by-transfer analysis of Boosalis' promissory notes should be excluded in light of *Finn*. (Def.'s Mem. Supp. of Mot. in Limine No. 4 ¶ 2 [Doc. No. 48].) Boosalis contends that Martens cannot account for the ultimate use or disposition of every one of Boosalis' transfers, some of which may have funded legitimate business expenditures. (*Id.* ¶ 14.) He points to certain deposition testimony in which Martens acknowledged that the funds received by

PCI were "comingled," some of which may have been used for apparently legitimate purchases such as "Apex or Samsonite." (*Id.* ¶¶ 10–11). Accordingly, Boosalis argues, because Martens did not analyze Boosalis' transfers individually once they reached PCI, his testimony exceeds the scope of his expertise and should be excluded. (*Id.* ¶¶ 17–18, 20.)

## B. Trustee's Response

The Trustee contends that while *Finn* requires evidence of each transfer, neither *Finn* nor any other applicable law requires the Trustee to trace the sources and uses of the funds exchanged between Defendant and PCI. (Pl.'s Main Opp'n at 6) (citing 860 N.W.2d 638). Rather, he argues, Martens' expert report details each of Boosalis' transactions with PCI. (*Id.*) Moreover, in his Tracing Report, Martens did trace the potential sources of funding to, or use of proceeds from, each of Boosalis' transfers with PCI. (*Id.*) (citing Third Hanson Decl., Ex. 1 (Exs. D & E to Martens Tracing Report [Doc. No. 78-1]).)

In the Tracing Report, Martens "concluded that there was no evidence to indicate that the source or use of any transfers to or from [Boosalis] were related to potentially real purchases and/or sales transactions," instead of fraudulent activities. (*Id.* at 7–8) (citing Martens Tracing Report ¶ 36) ("there was no evidence to indicate that the source/use of the transfers to/from [Boosalis] were related to potentially real purchases and/or sales transactions").

## C. Ruling

The Court will not rule on this motion before the testimony in question is offered and proper foundation has been laid.

## Defendant's Motion in Limine No. 5 [Doc. No. 49]: Interest Rates

### A.     Defendant's Argument

Boosalis argues that Martens may not opine on the reasonableness of the interest paid on Boosalis' promissory notes. (Def.'s Mem. Supp. Mot. in Limine No. 5 ¶ 1 [Doc. No. 50].)  He contends that Martens does not have the requisite experience or knowledge in purchase order financing or diverting businesses to offer this opinion, and he failed to conduct a proper analysis. (*Id.* ¶¶ 3–4, 14.)    Accordingly, Boosalis asserts, Martens' opinion as to the reasonableness of interest rates is unreliable. (*Id.* ¶ 14.)

### B.     Trustee's Response

The Trustee maintains that Martens has the requisite knowledge and experience related to the financial transactions in question, as he has been involved in account investigations related to PCI for "nearly a decade" and has worked as a Certified Public Accountant since 1981. (Trustee Main Opp'n at 11) (citing Third Hanson Decl., Ex. 1 (Ex. 1 to Martens Tracing Report [Doc. No. 78-1]).)  Thus, the Trustee contends, it is within the scope of Martens' expertise to compare typical lending rates with the rates on Boosalis' notes—rates that ranged from 38.71% to 70.82% on an annualized basis for transactions characterized as zero-risk deals for the purchase and resale of goods to a guaranteed buyer. (*Id.*) (citing Third Hanson Decl., Ex. 1 (Martens Tracing Report ¶ 8).)  Also, the Trustee notes that Defendant will have the opportunity to cross examine Martens and the jury will decide how much weight to afford his testimony. (*Id.* at 12) (citing *Weaver v. Mobile Diagnostech, Inc.*, Civ. No. 02-1719, 2009 WL 1230297, at *8 (W.D. Pa. April 30, 2009)).

The Trustee therefore asserts that the Court should allow Martens to testify regarding the reasonableness of interest paid on Boosalis' promissory notes, or defer the question until trial, when the Court will be more familiar with Martens' knowledge and experience with respect to Defendant's note transactions with PCI. (*Id.*)

### C. Ruling

Subject to proper foundation being laid, the Court defers ruling on this motion until trial.

## III. Trustee's Motions in Limine

### Trustee's Motion in Limine No. 1 [Doc. No. 58]: Evidence Concerning Vice President Walter Mondale, Ted Mondale, and Tom Hays

### A. Trustee's Argument

The Trustee seeks to preclude evidence concerning the supposed involvement of Ted Mondale and former Dorsey & Whitney attorneys Vice President Walter Mondale and Tom Hay, with Tom Petters. (*See* Pl.'s Mem. Supp. Mot. in Limine No. 1 at 2 [Doc. No. 59].) Specifically, with respect to Hay, the Trustee seeks to exclude evidence regarding Hay's work for Petters-related entities other than PCI. (*Id.* at 1.) Boosalis has asserted that their purported involvement with Petters played a role in Boosalis' decision to lend funds to PCI, because it suggested that Petters was running a legitimate business. (*Id.*) The Trustee contends that this evidence does not meet the relevance standard under Federal Rule of Evidence 401 and should also be excluded as unfairly prejudicial under Federal Rule of Evidence 403. (*Id.* at 4.)

In a separate adversary proceeding in Bankruptcy Court, Ted Mondale testified that beginning in approximately 1999 through 2002 or 2003, he was the part-time President of Red Tag World, a Petters-controlled entity unrelated to PCI.[6] (First Hanson Decl. [Doc. No. 60], Ex. C (Mondale Dep. at 8, 17 [Doc. No. 60-1]).) He testified that his primary duty was to travel to Asia four times per year to develop relationships between Red Tag World and various Asian enterprises, (*id.* at 9), and that he was not involved with PCI or any Petters-related financial transactions. (*Id.* at 18.) Also, Mondale stated that his father, Vice President Mondale, never served as an officer, director, employee, or attorney for any Petters entity, although at one time, perhaps unbeknownst to Vice President Mondale, Tom Petters identified him as a "senior advisor" to Red Tag Japan. (*Id.* at 14–15.) Ted Mondale testified that his father had very little to do with Red Tag Japan, noting that he helped arrange a meeting between Ted and a Japan-based chamber of commerce and made an introduction. (*Id.* at 19–20.)

Tom Hay is a retired Dorsey & Whitney attorney who worked with the Petters entities from approximately 1998 to 1999 as Executive Vice President, Legal Affairs and Development. (Hanson Decl., Ex. E (Hay Dep. at 42–44, 69).) He testified that he was unaware of the specific Petters entity for which he worked. (Id. at 44.) Hay also testified

---

[6] In the separate Bankruptcy Court proceeding, certain defendants had sought discovery concerning Dorsey & Whitney's relationship with PCI and other Petters entities unrelated to PCI. (*See* Pl.'s Mem. Supp. Mot. in Limine No. 1 at 2–3.) Although the Bankruptcy Court questioned the relevance of the evidence, (First Hanson Decl. [Doc. No. 60], Ex. B (Bankr. D. Minn. Oct. 25, 2017 Hr'g Tr. at 21 [Doc. No. 60-1])), it permitted the deposition of Ted Mondale.

that he did not assist or participate in any PCI transactions, nor did he see a PCI bank statement. (*Id.* at 188–89.)

In addition to stressing the limited involvement of the Mondales and Hay with Petters, the Trustee also emphasizes the lack of a temporal connection between Boosalis' investments and the time periods in which the Mondales and Hay worked for Petters-related entities. He contends that Ted Mondale did not become part-time president of Red Tag World, and Vice President Mondale was not identified as a senior advisor to Red Tag World, until 1998—two years after Boosalis had executed his December 1996 promissory note to PCI. (Pl.'s Mem. Supp. Mot. in Limine No. 1 at 5.) Thus, the Trustee asserts, any suggestion that the Mondales influenced Boosalis' due diligence, is belied by the fact that Boosalis made his investments in PCI before the Mondales were involved with Red Tag World. (*Id.* at 4–6.) Finally, the Trustee asserts that Boosalis never spoke to Walter or Ted Mondale about their involvement with Red Tag World. (*Id.*)

Similarly, the Trustee asserts that Boosalis made his initial investments in PCI in December 1996, well before Hay began working for the Petters entities in early 1998. (*Id.* at 6.)

### B.     Defendant's Response

Boosalis responds that evidence regarding the Mondales and Hay is relevant to "issues of good faith" and the appearance of legitimacy because "[t]he involvement of the Mondales and Mr. Hay lent credibility to [PCI's] good-will." (Def.'s Opp'n to Pl.'s Mot. in Limine No. 1 ¶¶ 2, 5–6, 8 [Doc. No. 70].)

Regarding the Mondales, Boosalis asserts that numerous magazine articles and Petters' publicity materials noted their association with Tom Petters and PCI, although Boosalis does not provide any examples as exhibits. (*Id.* ¶ 3.) Boosalis states that while he does not intend to call either of the Mondales as trial witnesses, he plans to mention them during his own testimony. (*Id.* ¶ 13.) As to Hay, Boosalis acknowledges that he never spoke with him directly. (*Id.* ¶ 6.) However, Boosalis claims that even if Hay's involvement with Petters did not begin until 1997, Hay's involvement nonetheless caused Boosalis to continue to loan money to PCI. (*Id.*)

### C.    Ruling

The Court finds that any evidence concerning the involvement of the Mondales is irrelevant to Defendant's decision to engage in transactions with PCI. Boosalis' investments were with PCI and were initially made before any involvement of the Mondales with Red Tag World. Neither Vice President Mondale nor Ted Mondale were involved with PCI, and Vice President Mondale's role even with respect to Red Tag World was minimal. Plaintiff's motion in limine is therefore granted with respect to evidence concerning the Mondales.

Hay's involvement with the Petters' entities was a bit less clear, as Hay testified that he was unsure which Petters entity initially employed him. (Hanson Decl., Ex. E (Hay Dep. at 44) ("Q: Who did you think you were working for in the beginning? A: Petters Company; Q: Inc. or -- ? A: I don't know, working for Petters. I mean, it didn't matter to me. They were putting me on the payroll and they were going to send me $5,000 a month, as long as I wasn't fired."). Although Hay disclaimed any involvement with PCI financial

transactions, (*id.*, Ex. A (Hay Dep. 188–89), given Hay's potentially broader role within "the Petters entities," to the extent that evidence demonstrates his involvement with PCI, it may be relevant to Boosalis' defense. However, the Trustee does not seek to exclude evidence regarding Hay as it relates to Hay's work for PCI. (*See* Pl.'s Mem. Supp. Mot. in Limine No. 1 at 1.)

At the hearing on the motions in limine, the Court requested that the Trustee file a complete copy of Hay's deposition. Following the Court's review of the deposition transcript, it will rule on this motion. Accordingly, a ruling on this portion of the Trustee's motion is deferred.

<u>**Trustee's Motion in Limine No. 2 [Doc. No. 63]:**</u>
<u>**Hearsay in Investigative Reports**</u>

**A.     Trustee's Argument**

The Trustee argues that eleven FBI and IRS investigative memoranda should be excluded from evidence on hearsay grounds. (Pl.'s Mem. Supp. Mot. in Limine No. 2 at 1 [Doc. No. 64].) These documents were filed as Defendant's Trial Exhibits D-2 through D-12. The Trustee contends that the reports contain hearsay within hearsay, pointing to out-of-court statements made by the agents who conducted the interviews, as well as the statements purportedly made by the interviewees, some of whom relied on yet more hearsay in responding to the agents' questions. (*Id.* at 1–2.)

Considering the multi-layered hearsay, the Trustee asserts that the reports are not admissible under the business records or public records exception to the hearsay rule. (*Id.*) (citing Fed. R. Evid. 803(6), 803(8).) In addition, the Trustee argues that the residual

exception to the hearsay rule, Federal Rule of Evidence 807, is inapplicable because there is no guarantee of the statements' trustworthiness, as the statements in question were not made under oath and were summarized by an agent. (*Id.* at 3.)  Moreover, the Trustee asserts that the statements are not recorded recollections under Federal Rule of Evidence 803(5) because the witnesses did not make or adopt the reports, the reports were not transcripts, and the reports were not signed by the witnesses. (*Id.*)

### B.     Defendant's Response

Boosalis argues that the memoranda should be admitted under the hearsay exceptions for regularly conducted business activity, Fed. R. Evid. 803(6), or public records, Fed. R. Evid. 803(8).  (Def.'s Opp'n to Pl.'s Mot. in Limine No. 2 [Doc. No. 69].)  The reports that Boosalis seeks to admit, he asserts, satisfy the criteria for the business records exception, because (1) they were made at or near the time of the interview and were transmitted by a person with knowledge; (2) they were kept in the regular course of business; (3) FBI and IRS agents regularly draft such memoranda; (4) the documents bear signatures or certification; and (5) there is no indication of a lack of trustworthiness.  (*Id.* at 3.)

Boosalis also claims that the memoranda are admissible pursuant to the public records exception to the hearsay rule, asserting that under this rule, "factual findings resulting from an investigation made pursuant to authority granted by law" may be admitted, unless a lack of trustworthiness is indicated.  (*Id.* at 4) (citing *Gardner v. Comm'r of Pub. Safety*, 423 N.W.2d 110, 114 (Minn. Ct. App. 1988).)  Defendant contends that this exception is satisfied because: (1) the memoranda set forth the agents' activities; (2) the

subject matter was observed in the course of the declarants' legal duties; (3) the investigation was part of a criminal case; and (4) the source does not lack trustworthiness, as the memoranda are signed by the agents in question. (*Id.*)

Additionally, Boosalis contends that the reports fall under the residual exception to the hearsay rule, which permits a court to admit statements that have "circumstantial guarantees of trustworthiness" provided that they also meet the other requirements for admissibility including "materiality, probative value, the interests of justice, and notice." (*Id.* at 4–5) (citing *United States v. Halk*, 634 F.3d 482, 488–89 (8th Cir. 2011)).

Finally, Boosalis claims that at least one of the witnesses interviewed, Deanna Coleman, will testify at trial. (*Id.* at 2.) Boosalis states that he will only seek to admit the report in question for purposes of impeachment. (*Id.*)

### C.     Ruling

Under Federal Rule of Evidence 805, hearsay within hearsay is inadmissible unless "'each part of the combined statements conforms with an exception to the rule [against hearsay].'" *Glaze v. Byrd*, 721 F.3d 528, 533 (8th Cir. 2013) (quoting Fed. R. Evid. 805). Here, even if the memoranda in question were regularly maintained in the course of the agencies' "businesses," or constitute public records, the witness statements contained within the documents remain hearsay, and in some instances, hearsay within hearsay. Boosalis does not identify the hearsay exceptions applicable to the specific portions of these reports.

Moreover, the residual exception under Fed. R. Evid. 807 is inapplicable. Evidence admitted under this exception requires the proponent to establish that:

(1) the statement has equivalent circumstantial guarantees of trustworthiness;

(2) it is offered as evidence of a material fact;

(3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and

(4) admitting it will best serve the purposes of these rules and the interests of justice.

Fed. R. Evid. 807 (a). This rule is applied "very rarely and only in exceptional circumstances." *Halk*, 634 F.3d at 489. As the Trustee notes, these interviews, which were not made under oath, nor transcribed, fail to satisfy the requirement of circumstantial guarantees of trustworthiness.

To the extent that Coleman is expected to testify, "a law enforcement memorandum "is not more probative . . . than live testimony." *See United States v. Sparkmak*, 235 F.R.D. 454, 461 (E.D. Mo. 2006). If Coleman testifies, Defendant will have an opportunity to obtain testimony. But many of the statements attributed to Coleman in the IRS memoranda marked as D-5, are hearsay, and contain hearsay within hearsay.

For all the foregoing reasons, Plaintiff's motion is granted, and these memoranda are excluded from evidence as they contain inadmissible hearsay.

## IV. Order

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant's Motion in Limine No. 1, to exclude any and all evidence, references to evidence, testimony, or any argument from Plaintiff's expert,

Theodore Martens, relating to reasonably equivalent value [Doc. No. 41], is **DEFERRED**;

2. Defendant's Motion in Limine No. 2, to preclude Plaintiff's expert, Theodore Martens, from testifying with respect to any transfer-by-transfer analysis re: insolvency [Doc. No. 43], is **DEFERRED**;

3. Defendant's Motion in Limine No. 3, to exclude evidence and testimony of criminal prosecutions [Doc. No. 45] is **DENIED**;

4. Defendant's Motion in Limine No. 4, to exclude any and all evidence, testimony or any argument from Plaintiff's expert, Theodore Martens, relating to transfer-by-transfer analysis of Defendant's notes [Doc. No. 47], is **DEFERRED**;

5. Defendant's Motion in Limine No. 5, to exclude any and all evidence and testimony by Plaintiff's expert, Theodore Martens, relative to interest rates paid to defendant [Doc. No. 49], is **DEFERRED**;

6. The Trustee's Motion in Limine No. 1 [Doc. No. 58] is **GRANTED in part** with respect to the exclusion of evidence regarding and testimony from Vice President Mondale, and his son, Ted Mondale, and **DEFERRED in part** with respect to evidence regarding and testimony from Tom Hay regarding his work for Petters-related entities other than Petters Company, Inc.; and

7. The Trustee's Motion in Limine No. 2, to exclude any IRS or FBI investigative memoranda Defendant may seek to admit into evidence [Doc. No. 63], is **GRANTED**.

November 19, 2018

s/Susan Richard Nelson
Susan Richard Nelson
United States District Judge